UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION (AKRON)

|  |  |  |
|---|---|---|
| IN RE: | ) | CASE NO. 18-BK-52112 |
|  | ) |  |
| GLENN E. HOLDEN | ) |  |
|  | ) | CHAPTER 7 |
| ANN M. HOLDEN | ) |  |
|  | ) |  |
| Debtors | ) | JUDGE: KOSCHIK |

## MOTION FOR DAMAGES AND SANCTIONS FOR CREDITOR MISCONDUCT

Now come Debtors, Glenn and Ann Holden, who humbly bring to this Court's attention an egregious and intentional violation of the Automatic Stay under §362 by the Holden's loan servicer, Select Portfolio Servicing ("SPS"). SPS is the servicing agent for Deutsche Bank National Trust Company ("Deutsche"), in this case acting as Trustee for the Soundview Home Loan Trust 2005-4, Asset-Backed Certificates, Series 2005-4. Both SPS and Deutsche are represented by counsel in the above matter.

The Holdens are requesting this Court award them damages, sanctions, and attorney's fees from both SPS and Deutsche, jointly and severally, due to their inexcusable and willful violation of §362. A discussion of damages will occur at the end of this Motion.

1

Respectfully Submitted,

Mark F. Graziani #0092927
Graziani Law, LLC
P.O. Box 1158
Norton, OH 44203
(330) 571-3350 (cell)
mark_graziani@yahoo.com

Attorney for Glenn and Ann Holden

2

## A BRIEF RECITATION OF THE SALIENT FACTS

**Note**: Deutsche spent five years (2011-2016) and many thousands of dollars in litigation over the Holdens' meager homestead, currently appraised by Summit County at $49,350. For a complete synopsis of the Holdens' story, the Holdens refer the Court to the *Debtors' Pre-Petition Brief.*

**Facts:**

1. In 2005, the Holdens purchased their home at 1050 Shadybrook with a mortgage, and a lien for $69,300 was attached to the property. Eventually and unbeknownst to the Holdens, this mortgage was assigned to Deutsche.

2. In 2010, the Holdens filed Chapter 7, which was concluded in early 2011. This bankruptcy ended their personal obligation under their mortgage note, but the Deutsche lien was still attached to the property. Shortly after the bankruptcy case concluded, Deutsche filed a foreclosure on the property.

3. Five years of litigation ensued, moving from Summit County Common Pleas to the 9th District Court of Appeals and, eventually, to the Ohio Supreme Court. Deutsche eventually prevailed and the foreclosure resumed in 2016.

4. The Holdens stopped the foreclosure in 2017 by entering into a modified, albeit onerous, loan with SPS. Once payments began to SPS, the foreclosure action ended.

5. It was ***assumed*** at the time that SPS was acting as servicing agent for Deutsche, but the Holdens never knew who actually held the note throughout the pendency of their litigation. [*Pre-Petition Brief*] Nevertheless, the foreclosure stopped when SPS began servicing the loan.

6. Despite the original Deutsche lien being $69,300, the onerous 2017 SPS loan was for approximately $120,000.

7. **The 2017 SPS loan was never recorded on the property at 1050 Shadybrook.**

8. Throughout 2017 and 2018, the Holdens consistently made timely house payments to SPS. Yet, the Holdens were carrying a large number of medical and legal bills from the 2011-2016 litigation, and decided to file another Chapter 7 after the eight-year moratorium had passed.

9. Because of the 2011-2016 confusion over their mortgage, the Holdens conducted an official lien search on the property just prior to the 2018 Chapter 7 filing. They wanted to be absolutely certain of their property's status with regard to liens. A copy of this lien search is attached as Exhibit A.

10. On September 2, 2018, the Holdens filed Chapter 7, and the Automatic Stay under §362 immediately was set in place.

11. In the Holdens' petition, the 2005 Deutsche lien for $69,300 was listed on Schedule 106D, line 2.3, as a secured claim on the property.

12. Also in the Holdens' petition, the 2017 SPS loan for $115,295 was listed on Schedule 106E/F, line 4.37 (page 14), as unsecured debt. It was listed as an "unperfected mortgage."

13. On September 7, 2018, Attorney LeAnn Covey of Clunk, Hoose, Co., LPA, in Stow, Ohio filed a notice of appearance for Deutsche with the Court.

14. **The Holdens bankruptcy filing subsequently alerted SPS and Deutsche to the fact that SPS had an unperfected interest for $115,295 in the 1050 Shadybrook property.**

15. **On September 18, 2018, unbeknownst to the Holdens, the Holdens' counsel, and the bankruptcy trustee, SPS quietly and surreptitiously recorded the SPS loan with the Summit County Recorder in order to perfect their interest in the property. A copy of this dated, recorded document is attached as Exhibit B.**

4

16. **The recording of the SPS loan two weeks after the Automatic Stay was in place was a willful and intentional violation of §362 designed to preserve SPS/Deutsche's interest in the property and elevate it over the other unsecured creditors.**

17. On October 12, 2018, the office of Clunk, Hoose Co., LPA sent counsel a reaffirmation agreement for the SPS loan for the Holdens via email. Curiously, this email failed to mention the fact that SPS had fraudulently perfected their interest on the property just three weeks before in a purposeful violation of the Automatic Stay.

18. The SPS reaffirmation agreement attempts to perpetrate a fraud upon the Holdens and the Court. On Official Form 427, line 4, as prepared by SPS and Clunk, Hoose, it states:

> *Does collateral secure the debt? Yes. Describe the collateral: 1050 Shadybrook Dr.*

A copy of the unsigned Form 427, as prepared by Clunk, Hoose, is attached as Exhibit C.

19. The reaffirmation agreement was sent by Clunk, Hoose on October 12, 2018. Because of the proximity to the §341 hearing on October 31, 2018, the Holdens chose not to act upon the reaffirmation agreement until after the hearing.

20. Because the $115,295 SPS loan was listed on the petition as unsecured debt, the Holdens fully expected SPS/Deutsche to attend the §341 hearing and vigorously object to the characterization of the SPS debt as unsecured. No creditor attended this meeting.

21. Puzzled by SPS/Deutsche's failure to appear to preserve their interest, Ann Holden started sleuthing and discovered that SPS had fraudulently recorded the loan five weeks prior to the §341 hearing. Based upon SPS/Deutsche's lack of appearance at the hearing, it appears SPS/Deutsche was content with the status of the case after they had cheated everyone involved to reposition themselves as a secured creditor.

5

22. The Holdens were fully prepared to negotiate a new loan with SPS until the company decided to act in such a highly deceitful and illegal manner as to announce their absolute untrustworthiness.

23. The Holdens now bring this very improper and illegal behavior to the Court's attention. There is absolutely no excuse for two large companies that specialize in loans and mortgages, and who are represented by counsel, to intentionally and willfully violate a basic pillar of the Bankruptcy Code in order to perpetrate a fraud upon the Holdens, counsel, the bankruptcy trustee, and this Court.

24. The Holdens now humbly ask this Court for monetary damages, punitive sanctions, and attorney's fees for having to bring this action against SPS and Deutsche. A discussion of damages will occur later in this document.

**Analysis:**

25. The U.S. Bankruptcy Code §362(a)(5) states:

> [A] petition filed under section 301 … operates as a stay, **applicable to all entities**, of –
>
> (5) **any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title**; [Emphasis added]

Where the term "perfection" refers to the act of validating a security interest to the hierarchical detriment of other creditors.

26. SPS illegally validated its claim against the Holdens' property by intentionally violating Federal law. It did this so its claim would be given preferential treatment above the others without anyone noticing the change in priority.

27. By improperly elevating its claim above the others, SPS/Deutsche is trying to perpetrate a fraud upon the Court, the trustee, the Holdens, and counsel. SPS realized, after it received notice

6

of the Chapter 7 filing, that it had made a grave mistake – it never recorded the Holdens' mortgage. Suddenly, SPS's unsecured mortgage was at risk, and the company's first and immediate reaction was to intentionally break the law to remedy their mistake.

28. In <u>In Re: Oldham v. Heights Finance Corp.</u>, the court discussed how fundamental the automatic stay is in bankruptcy:

> As Congress has stated: The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collections efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy. ¶6, Case No. 04-41692, U.S. Bankruptcy Court, S.D. Illinois (2006).

29. Despite the fundamental character of the stay that gives relief to the debtor, SPS decided to intentionally elevate its own interests over Congress's relief to the debtor by willfully breaking the law.

30. In <u>Oldham,</u> one of the debtor's creditors perfected a security interest some seven weeks after the Oldhams filed for bankruptcy. The court swiftly disposed of any justification the creditor had for doing so:

> The [automatic] stay remains in effect until the case is either dismissed or completed or until the debtor obtains a discharge. 11 U.S.C. §362(c)(2). In the instant case, there is no question that the creditor perfected its lien on the debtor's property after the imposition of the automatic stay. Hence, the creditor's actions constituted a violation of §362(a)(5) of the Bankruptcy Code. ¶4.

31. The court quickly concluded:

> [T]he vast majority of courts that have addressed the issue, including this Court, have concluded that actions taken in violation of the automatic stay are void and without effect. ¶5.

32. The Holdens would like to point out one distinction between <u>Oldham</u> and the case sub judice. The creditor in <u>Oldham</u> was a small finance corporation who lent money to the Oldhams

7

to buy a boat and trailer. The creditor may have absent-mindedly perfected the lien in violation of §362 by sending in the titles to the state; there was no indication of intentional deception or fraud by the creditor. In the Holdens' case, however, the violation of §362 by SPS/Deutsche was performed *secretly, quietly, deceptively, dishonestly, and fraudulently*; SPS/Deutsche knew exactly what they were doing, and why they were doing it – elevating their own interests in complete disregard for the law.

33. Both SPS and Deutche are large corporations that specialize in mortgages and lending; both are fully aware of bankruptcy laws and §362. This knowledge and expertise in the field of lending makes their illegal behavior all the more reprehensible – *both companies knew better and they purposely violated the law in a blatant disregard of the United States Bankruptcy Code.*

34. Had it not been for the sleuthing of Ann Holden, it is very possible both companies would have never been caught. If SPS/Deutsche can so cavalierly and easily break the law with so little provocation, what does this say about the character of each, and how many clueless victims of their deceitful behavior are there? Both SPS and Deutsche demand honesty out of their customers; apparently, neither provides the favor in return.

35. In In Re Schwartz, the court stated the benefit of §362:

> The Bankruptcy Code does not burden the debtor with a duty to take additional steps to secure the benefit of the automatic stay. Those taking post-petition collection actions have the burden of obtaining relief from the automatic stay. 954 F.2d 569, 572 (9th Cir. 1992).

36. Had Ann Holden not taken those additional steps to find out why SPS/Deutsche did not appear at the §341 hearing, the Holdens would have been dishonestly stripped of the benefits of the automatic stay. There is absolutely no excuse for SPS/Deutsche's behavior.

37. The Oldham court succinctly concluded, as is the case here:

> [T]he creditor's act of perfecting its lien in violation of the automatic stay renders its lien void *ab initio.* ¶10. [Emphasis in original]

38.  **The Holdens humbly request this Court to render SPS/Deutsche's lien, recorded on September 18, 2018, sixteen days after the Holdens' Chapter 7 petition was filed, void ab initio. Because this act was intentional and willful in violation of §362, the Holdens request monetary damages, sanctions, and attorney's fees for bringing this action.**

**Fraud:**

39.  Fraud is defined as "intentional misrepresentation of material existing fact made by one person to another with knowledge of its falsity and for the purpose of inducing the other person to act, and upon which the other person relies with resulting injury or damage."

40.  Aside from SPS/Deutsche's intentional and willful violation of §362, SPS/Deutsche committed fraud by attempting to attach *an additional* lien onto the 1050 Shadybrook property. SPS attempted to double-record the same debt, and indicated to the Summit County Recorder that the debt was valid.

41.  As noted above, a lien search was conducted just prior to the bankruptcy filing [Exhibit A]. On Exhibit A, the valid 2005 Deutsche lien for $69,300 is listed under "a." and is still in place.

42.  When SPS entered into a loan agreement with the Holdens in 2017, the company was acting as agent for Deutsche, and under the authority of Deutsche's 2005 lien.

43.  The Holdens' onerous $120,000 SPS loan subsumed the 2005 Deutsche lien for $69,300. After all, the new loan stopped Deutsche from foreclosing on its interest, the house.

44.  When SPS violated the law by recording the $120,000 loan after the stay was in place, it re-recorded *another* $69,300 lien. The 2005 Deutsche lien was already in place and was never released, and the new loan contained the original $69,300 amount, ***as well***. Had any part of

9

SPS/Deutsche's behavior been proper and honest, the company would have released the first lien on behalf of the second, which already included the first.

45. Had the dishonest perfection of SPS/Deutsche's interest not been caught and been deemed void ab initio by action of law, SPS/Deutsche would then have a perfected interest in 1050 Shadybrook for $189,300[1]. A kingly sum for a house currently appraised at $49,350.

46. Because SPS/Deutsche attempted to record an additional $120,000 lien on top of Deutsche's already-existing lien, the Holdens believe this was an intentional act to cheat them out of even more money. They sincerely believe this was a punitive act by SPS/Deutsche. Since the dishonestly-recorded lien would have bilked the Holdens out of an additional $120,000, the Holdens are using this exact amount as the measure of damages. The Holdens humbly request this Court to assess SPS/Deutsche, jointly and severally, with monetary damages for fraud and improper conduct amounting to $120,000.

47. On top of the $120,000 they request, the Holdens request sanctions against both SPS and Deutsche, jointly and severally, in whatever forms the Court deems just.

48. Lastly, the Holdens request $1000 in attorney's fees from SPS/Deutsche for having to bring this action.

**Wells Fargo Home Mortgage, Inc. v. Lindquist**

49. Lastly, the Holdens would like to direct the Court's attention to Wells Fargo Home Mortgage, Inc. v. Lindquist, 592 F.3d 838 (US Court of Appeals, 8th Circuit, 2010).

50. In Lindquist, Wells Fargo gave Lindquist a mortgage loan, but failed to record the loan. Two-and-a-half years later, Lindquist filed for Chapter 7 bankruptcy.

51. In the petition, Lindquist erroneously listed Wells Fargo as a secured creditor. It was not until after the discharge the trustee discovered that Wells Fargo was an unsecured creditor. The trustee then reopened the estate.

52. The trustee's analysis of the situation began with §547(e)(2)(C), which states:

> For the purposes of this section …a transfer is made:
> (C) immediately before the date of the filing of the petition, if such transfer is not perfected at the later of:
> (i) the commencement of the case; or
> (ii) 30 days after such transfer takes effect between the transferor and the transferee.

53. Because Wells Fargo did not perfect its interest in the mortgage in the 2 ½ years before Lindquist filed his petition, the trustee determined the "transfer" of the mortgage to Wells Fargo from Lindquist was deemed to occur immediately before the date of the filing of the petition. Both the bankruptcy court and the court of appeals agreed.

54. The court determined:

> This "transfer" of the mortgage is deemed to have occurred immediately before the debtor's October 14, 2005 bankruptcy filing by operation of §547(e)(2)(C) because Wells Fargo failed to record the mortgage. Id., at 843.

55. Under §547(b), the trustee has power to avoid any transfer of an interest of the debtor in property, provided the following are all true:

> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4)(A) made on or within 90 days before the date of the filing of the petition;
> (5)(A) that enables such creditor to receive more than such creditor would receive if the case were a case under Chapter 7 of this title;

56. The court of appeals fully agreed with the trustee's reasoning:

> There is no dispute that the debtor's grant of a mortgage to Wells Fargo was a "transfer of an interest of the debtor in property," that the transfer was "made while the debtor was insolvent," or that §547(e)(2)(C) deems the transfer of the

11

mortgage to have occurred "within 90 days before the date of the filing of the [bankruptcy] petition." Id.

57. Because all the conditions were met by Wells Fargo's failure to record the mortgage, the trustee could avoid the transfer of the interest to Wells Fargo under §547(b). The court agreed:

> We hold that the pre-petition transfer of the mortgage to Wells Fargo was preferential under §547(b) and that the trustee was entitled to judgment as a matter of law. Accordingly, the bankruptcy court properly avoided the transfer of the mortgage to Wells Fargo under §547(b).

58. Finally, in Lindquist, Wells Fargo sold the mortgage to a third party as an unsecured creditor and realized the value of the mortgage to the detriment of other unsecured creditors. Because of this preferential treatment, Wells Fargo had to pay the reopened bankruptcy estate the value of the mortgage, $190,808.71, to then be distributed to other creditors as the trustee determined proper.

59. The factual history of the Holdens' case is remarkably similar to Lindquist. SPS failed to record its mortgage in the year-and-a-half prior which, under §547(e)(2)(C), dates it to immediately before the filing of the Holdens' petition.

60. Due to this operation of law, every condition under §547(b) is now met. The Holdens' trustee has the power to avoid any transfer of an interest of the debtor in 1050 Shadybrook;

> (1) to or for the benefit of SPS/Deutsche;
> (2) for or on account of an antecedent debt owed by the Holdens before such transfer was made;
> (3) made while the Holdens were insolvent;
> (4)(A) made on or within 90 days before the date of the filing of the petition;
> (5)(A) that enables such SPS/Deutsche to receive more than SPS/Deutsche would receive if the case were a case under Chapter 7 of this title;

61. Because §547(b) is now met, the trustee can avoid the transfer of the Holdens' unsecured mortgage to SPS.

12

62. SPS is an unsecured creditor in the amount of $115,295. Should it choose to do so, it could sell its loan for this amount and unfairly benefit to the detriment of the bankruptcy estate and the other unsecured creditors.

**Conclusion:**

63. On July 31, 2017, the Holdens entered into a mortgage loan agreement with SPS. This loan was never recorded.

64. On September 2, 2018, the Holdens filed Chapter 7 and the automatic stay went into place.

65. On September 18, 2018, SPS intentionally violated the automatic stay by recording the 2017 mortgage.

66. In addition to the intentional violation of §362, SPS double-recorded the Deutsche lien in an intentional act of fraud.

67. The improper 2018 SPS/Deutsche lien is void ab initio by operation of law because of §362.

68. The "transfer" of the loan from the Holdens to SPS meets all the conditions of §547 and can be avoided by the trustee.

69. SPS can unfairly benefit by selling the Holden mortgage loan for face value to another party. Being an unsecured creditor, this improperly elevates SPS over the other unsecured creditors.

70. The Holdens' case is a no-asset-distribution Chapter 7. The unsecured creditors will receive no remuneration. The only equal treatment of all the unsecured creditors would be for SPS to receive nothing, as well.

71. The Holdens humbly request the following from the Court:

> -monetary damages from SPS/Deutsche, jointly and severally, in the amount of $120,000 for intentional violation of §362 (the exact amount the two companies were trying to bilk out of the Holdens);

13

-an Order voiding the September 18, 2018 SPS/Deutsche lien

-sanctions against the two companies, as the Court determines just, for violation of §362;

-attorney's fees in the amount of $1000 for bringing this action

-avoiding the SPS loan from 2017 as a preferential transfer properly voidable under §547

-any other determinations this Court deems appropriate

***

In sum, the Holdens are very exhausted from dealing with the pandemic untrustworthiness and fraudulent behavior of Deutsche Bank and now, of its agent SPS. Thousands of dollars and five years of litigation, replete with fraudulent filings by Deutsche [*Pre-Petition Brief*, at 19], did nothing to make the company's dealings with the Holdens any more honest. As soon as SPS realized its mistake after the Holdens filed their petition, the company's first reaction was to illegally violate one of the most foundational stanchions of the Bankruptcy Code, §362. There is absolutely no excuse for a company specializing in mortgages and lending to willingly choose to do something so violative of the law and its customers.

The Holdens humbly and exhaustedly request this Court to give them the relief they request in this Motion.

Respectfully Submitted,

Mark F. Graziani #0092927
Graziani Law, LLC
P.O. Box 1158
Norton, OH 44203
(330) 571-3350 (cell)
mark_graziani@yahoo.com

Attorney for Glenn and Ann Holden

Footnote:

1.  In actuality, there are still two other valid liens upon this property: Citi ($15,751.74) and Chase ($14,993.38), bringing the current total of proper and improper liens to the outrageous amount of $220,045.12.  The property is only worth, optimistically, $49,350 (Summit County Auditor).

# EXHIBIT A

**CHICAGO TITLE COMPANY, LLC**
**AKRON, OHIO**

## LIEN SEARCH
## MATTERS FOUND OF RECORD

Liens:

    a.    Mortgage from Glenn E. Holden and Ann M. Holden, husband and wife to Mortgage Electronic Registration Systems Inc., as nominee for Novastar Mortgage, Inc., in the amount of $69,300.00, and filed on September 15, 2005, and recorded in Reception Number 55234144, of the Summit County Records. Last Assignment of Mortgage to Deutsche Bank National Trust Company, as Trustee for Soundview Home Loan Trust 2005-4, Asset-Backed Certificates, Series 2005-4, filed on September 28, 2010 and recorded in Reception Number 55728242, of the Summit County Records.

    b.    Mortgage from Glenn E. Holden and Ann M. Holden, husband and wife to CitiFinancial, Inc., in the amount of $15,751.74, and filed on May 8, 2007, and recorded in Reception Number 55440102, of the Summit County Records.

    c.    Judgment Lien in favor of JP Morgan Chase Bank, N.A. and against Glenn Holden, in the amount of $14,993.38, plus interest and costs, filed for record January 27, 2010 in CV-2009-05-3778, in the Summit County Records.

           NOTE: Shown on Foreclosure Case CV-2011-08-4500

    d.    Compliance with requirements the Company deems necessary arising out of Foreclosure Action Summit County Common Pleas Court Case No. CV-2011-08-4500, filed August 12, 2011.

           NOTE: Dismissal not filed.

    e.    Taxes for the year of 2018 and subsequent installments thereafter, which are not yet due and payable. The County Treasurer's General Tax Records for the tax year 2017 are as follows:
PPN SP-00285-96-001.000
PM 51-09937
Taxes for the first half are paid.
Taxes for the second half are paid.
Per half amount $547.09.



56413070
Page 1 of 10
Summit Fiscal Officer KRISTEN M. SCALISE, CPA, CFE
Recording Fee: $96.00 Recorded 09/18/2018 02:14:05 PM

When recorded return to :
Richmond Monroe Group
82 Jim Linegar LN
Branson West, MO. 65737
SPS #

Prepared By:
Select Portfolio Servicing, Inc.
3217 S Decker Lake Dr
Salt Lake City, UT 84119
Krista Beierle
(801) 313-22214

Investor Loan # 0001991041
Loan # 0018345298

_____ Space Above for Recorder's Use _____

BCLN/TS-1084

## HOME AFFORDABLE MODIFICATION AGREEMENT

Borrower ("I"):

Original Borrower: Vesting: GLENN E. HOLDEN AND ANN M. HOLDEN, HUSBAND AND WIFE
Original Mortgagee: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR
NOVASTAR MORTGAGE, INC.
Date of Mortgage: SEPTEMBER 01, 2005
Original Loan Amount: $69,300.00
Recorded 09/15/2005, Instrument No 55234144, book NA and page NA
Recorded in the Official Records of SUMMIT, County, OH

Lender or Servicers ("Lender"):

Deutsche Bank National Trust Company as Trustee for Soundview Home Loan Trust 2005-4, Asset-
Backed Certificates, Series 2005-4

---

[1] If more than one Borrower or Mortgagor is executing this document, each is referred to as "I." For purposes of this document
words signifying the singular (such as "I") shall include the plural (such as "we") and vice versa where appropriate.

MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac UNIFORM
INSTRUMENT Form 3157   3/09  (rev. 10/10)

OB718                                                                                                   0018345298

Date of first lien mortgage, deed of trust, or security deed ("Mortgage") and Note ("Note"):
SEPTEMBER 01, 2005

Recorded in the Official Records of SUMMIT County, OH
As Instrument No., 55234144, book NA and page NA

Loan Number 0018345298

Property Address [and Legal Description if recordation is necessary]
1050 SHADYBROOK DRIVE
AKRON, OH 44312

LEGAL DESCRIPTION; ATTACHED HERETO AND MADE A PART HERE OF, AS EXHIBIT 'A' The within
described premises are or are to be improved by a one or two family residence or dwelling only.

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK**

[1] If more than one Borrower or Mortgagor is executing this document, each is referred to as "I." For purposes of this document
words signifying the singular (such as "I") shall include the plural (such as "we") and vice versa where appropriate.

MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac UNIFORM
INSTRUMENT Form 3157  3/09  (rev. 10/10)

OB718                                                                                    0018345298

Investor Loan # 0001991041

## HOME AFFORDABLE MODIFICATION AGREEMENT
### (Step Two of Two-Step Documentation Process)

Borrower ("I"): **GLENN E HOLDEN**
Lender or Servicer ("Lender"): **Select Portfolio Servicing, Inc.**
Date of first lien mortgage, deed of trust, or security deed ("Mortgage") and Note ("Note"): **September 1, 2005**
Loan Number: **0018345298**
Property Address [and Legal Description if recordation is necessary] ("Property"):
**1050 SHADYBROOK DRIVE**
**AKRON, OH 44312**

If my representations in Section 1 continue to be true in all material respects, then this Home Affordable Modification Agreement ("Agreement") will, as set forth in Section 3, amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage. The Mortgage and Note together, as they may previously have been amended, are referred to as the "Loan Documents." Capitalized terms used in this Agreement and not defined have the meaning given to them in Loan Documents.

I understand that after I sign and return two copies of this Agreement to the Lender, the Lender will send me a signed copy of this Agreement. This Agreement will not take effect unless the preconditions set forth in Section 2 have been satisfied.

1.  **My Representations and Covenants.** I certify, represent to Lender, covenant and agree:

    A.  I am experiencing a financial hardship, and as a result, (i) I am in default under the Loan Documents or default is imminent, and (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future;

    B.  One of the borrowers signing this Agreement lives in the Property as a principal residence, and the Property has not been condemned;

    C.  There has been no impermissible change in the ownership of the Property since I signed the Loan Documents. A permissible change would be any transfer that the lender is required by law to allow, such as a transfer to add or remove a family member, spouse or domestic partner of the undersigned in the event of a death, divorce or marriage;

    D.  I have provided documentation for all income that I receive (and I understand that I am not required to disclose child support or alimony unless I chose to rely on such income when requesting to qualify for the Home Affordable Modification program ("Program"));

    E.  Under penalty of perjury, all documents and information I have provided to Lender in connection with this Agreement, including the documents and information regarding my eligibility for the Program, are true and correct;

    F.  If Lender requires me to obtain credit counseling in connection with the Program, I will do so; and

    G.  I have made or will make all payments required under a Trial Period Plan or Loan Workout Plan.

    H.  I was discharged in a Chapter 7 Bankruptcy proceeding subsequent to the execution of the loan documents. Based on this representation, Servicer agrees that I will not have personal liability on the debt pursuant to this Agreement.

2.  **Acknowledgements and Preconditions to Modification.** I understand and acknowledge that:

    A.  If prior to the Modification Effective Date as set forth in Section 3 the Lender determines that any of my representations in Section 1 are no longer true and correct or any covenant in Section 1 has not been performed, the Loan Documents will not be modified and this Agreement will terminate. In that event, the Lender will have all of the rights and remedies provided by the Loan Documents; and

    B.  I understand that the Loan Documents will not be modified unless and until (i) the Lender accepts this Agreement by signing and returning a copy of it to me, and (ii) the Modification Effective Date (as defined in Section 3) has occurred. I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Agreement.

---

1.  If more than one Borrower or Mortgagor is executing this document, each is referred to as "I." For purposes of this document words signifying the singular (such as "I") shall include the plural (such as "we") and vice versa where appropriate.

OB718  1628                                                                                      0018345298

MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac
UNIFORM INSTRUMENT Form 3157
Deferred Principal Balance                                                        1126392

3. **The Modification**. If my representations and covenants in Section 1 continue to be true in all material respects and all preconditions to the modification set forth in Section 2 have been met, the Loan Documents will automatically become modified on **September 1, 2017** (the "Modification Effective Date") and all unpaid late charges that remain unpaid will be waived. I understand that if I have failed to make any payments as a precondition to this modification under a workout plan or trial period plan, this modification will not take effect. The first modified payment will be due on **September 1, 2017.**

A.   The Maturity Date will be: **October 1, 2035.**

B.   The modified principal balance of my Note will include all amounts and arrearages that will be past due as of the Modification Effective Date (including unpaid and deferred interest, fees, escrow advances and other costs, but excluding unpaid late charges, collectively, Unpaid Amounts) less any amounts paid to the Lender but not previously credited to my Loan. The new principal balance of my Note will be **$115,813.31** (the "New Principal Balance"). The New Principal Balance will consist of two (2) parts: (i) an amount which will accrue interest at the Note rate shown below, and on my monthly statement as Interest Bearing Principal Balance and (ii) an amount which will not accrue interest, shown below, and on my monthly statement as Deferred Principal Balance.

C.   **$34,743.99** of the New Principal Balance shall be deferred (the Deferred Principal Balance) and will be treated as a non-interest bearing principal forbearance. I will not pay interest or make monthly payments on the Deferred Principal Balance. In addition, **$34,743.99** of the Deferred Principal Balance is eligible for forgiveness (the Deferred Principal Reduction Amount). Provided I am not in default on my new payments such that the equivalent of three full monthly payments are due and unpaid on the last day of any month, on each of the first, second and third anniversaries of your first trial period payment date for three years, the Lender shall reduce the Deferred Principal Balance of my Note in installments equal to one-third of the Deferred Principal Reduction Amount. Application of the Deferred Principal Reduction Amount will not result in a new payment schedule. The New Principal Balance less the Deferred Principal Balance will be referred to as the Interest Bearing Principal Balance and this amount is **$81,069.32**. Interest at the rate of **3.750%** will begin to accrue on the Interest Bearing Principal Balance as of **August 1, 2017** and the first new monthly payment on the Interest Bearing Principal Balance will be due on **September 1, 2017**. My payment schedule for the modified Loan is as follows:

| Years | Interest Rate | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Estimated Monthly Escrow Payment Amount* | Total Monthly Payment* | Payment Begins On | Number of Monthly Payments |
|---|---|---|---|---|---|---|---|
| 1-19 | 3.750% | 08/01/2017 | $326.33 | $135.85, may adjust periodically | $462.18, may adjust periodically | 09/01/2017 | 218 |
| **A final balloon payment on the Interest Bearing Principal Balance of $58,316.03 is due on the Maturity Date.** | | | | | | | |

The Deferred Principal Balance of **$34,743.99** less any Deferred Principal Reduction Amount to which I am entitled will be due as a balloon payment on the earlier of, payoff of the Interest Bearing Principal Balance, transfer of the property or on the Modified Maturity Date. The above terms in this Section 3.C. shall supersede any provisions to the contrary in the Loan Documents, including but not limited to, provisions for an adjustable or step interest rate.

*The escrow payments may be adjusted periodically in accordance with applicable law and therefore my total monthly payment may change accordingly.

The above terms in this Section 3.C. shall supersede any provisions to the contrary in the Loan Documents, including but not limited to, provisions for an adjustable, step or simple interest rate.

I understand that, if I have a pay option adjustable rate mortgage loan, upon modification, the minimum monthly payment option, the interest-only or any other payment options will no longer be offered and that the monthly payments described in the above payment schedule for my modified Loan will be the minimum payment that will be due each month for the remaining term of the Loan. My modified Loan will not have a negative amortization feature that would allow me to pay less than the interest due resulting in any unpaid interest to be added to the outstanding principal balance.

MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac
UNIFORM INSTRUMENT Form 3157
Deferred Principal Balance

0018345298

1126392

I further understand that, provided I am not in default under the terms of this Agreement and I pay my Note in full, (i) any time more than 30 calendar day after the Modification Effective Date, and (ii) prior to the application of the entire Deferred Principal Reduction Amount, I shall be fully vested in and entitled to the unapplied amount of the Deferred Principal Reduction Amount and the unapplied amount shall be deducted from my pay off balance.

D.   I will be in default if I do not comply with the terms of the Loan Documents, as modified by this Agreement.

E.   If a default rate of interest is permitted under the Loan Documents, then in the event of default under the Loan Documents, as amended, the interest that will be due will be the rate set forth in Section 3.C.

4.  **Additional Agreements.**  I agree to the following:

A.   That all persons who signed the Loan Documents or their authorized representative(s) have signed this Agreement, unless (i) a borrower or co-borrower is deceased; (ii) the borrower and co-borrower are divorced and the property has been transferred to one spouse in the divorce decree, the spouse who no longer has an interest in the property need not sign this Agreement (although the non-signing spouse may continue to be held liable for the obligation under the Loan Documents); or (iii) the Lender has waived this requirement in writing.

B.   That this Agreement shall supersede the terms of any modification, forbearance, Trial Period Plan or other Workout Plan that I previously entered into with Lender.

C.   To comply, except to the extent that they are modified by this Agreement, with all covenants, agreements, and requirements of Loan Documents including my agreement to make all payments of taxes, insurance premiums, assessments, Escrow Items, impounds, and all other payments, the amount of which may change periodically over the term of my Loan.

D.   **Funds for Escrow Items.** I will pay to Lender on the day payments are due under the Loan Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under the Loan Documents; (d) mortgage insurance premiums, if any, or any sums payable to Lender in lieu of the payment of mortgage insurance premiums in accordance with the Loan Documents; and (e) any community association dues, fees, and assessments that Lender requires to be escrowed. These items are called "Escrow Items." I shall promptly furnish to Lender all notices of amounts to be paid under this Section 4.D. I shall pay Lender the Funds for Escrow Items unless Lender waives my obligation to pay the Funds for any or all Escrow Items. Lender may waive my obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, I shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in the Loan Documents, as the phrase "covenant and agreement" is used in the Loan Documents. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may exercise its rights under the Loan Documents and this Agreement and pay such amount and I shall then be obligated to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan Documents, and, upon such revocation, I shall pay to Lender all Funds, and in such amounts, that are then required under this Section 4.D.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac
UNIFORM INSTRUMENT Form 3157
Deferred Principal Balance                                                                        1126392

0018345298

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge me for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays me interest on the Funds and applicable law permits Lender to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, Lender shall not be required to pay me any interest or earnings on the Funds. Lender and I can agree in writing, however, that interest shall be paid on the Funds. Lender shall provide me, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to me for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by the Loan Documents, Lender shall promptly refund to me any Funds held by Lender.

E. That the Loan Documents as modified by this Agreement are duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed.

F. That all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and that except as otherwise specifically provided in, and as expressly modified by, this Agreement, the Lender and I will be bound by, and will comply with, all of the terms and conditions of the Loan Documents.

G. That, as of the Modification Effective Date, notwithstanding any other provision of the Loan Documents, if all or any part of the Property or any interest in it is sold or transferred without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Mortgage. Lender shall not exercise this option if state or federal law, rules or regulations prohibit the exercise of such option as of the date of such sale or transfer. If Lender exercises this option, Lender shall give me notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which I must pay all sums secured by the Mortgage. If I fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Mortgage without further notice or demand on me.

H. That, as of the Modification Effective Date, I understand that the Lender will only allow the transfer and assumption of the Loan, including this Agreement, to a transferee of my property as permitted under the Garn St. Germain Act, 12 U.S.C. Section 1701j-3. A buyer or transferee of the Property will not be permitted, under any other circumstance, to assume the Loan. Except as noted herein, this Agreement may not be assigned to, or assumed by, a buyer or transferee of the Property.

I. That, as of the Modification Effective Date, if any provision in the Note or in any addendum or amendment to the Note allowed for the assessment of a penalty for full or partial prepayment of the Note, such provision is null and void.

J. That, I will cooperate fully with Lender in obtaining any title endorsement(s), or similar title insurance product(s), and/or subordination agreement(s) that are necessary or required by the Lender's procedures to ensure that the modified mortgage loan is in first lien position and/or is fully enforceable upon modification and that if, under any circumstance and not withstanding anything else to the contrary in this Agreement, the Lender does not receive such title endorsement(s), title insurance product(s) and/or subordination agreement(s), then the terms of this Agreement will not become effective on the Modification Effective Date and the Agreement will be null and void.

OB718  1628

MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac
UNIFORM INSTRUMENT Form 3157

Deferred Principal Balance

0018345298

1126392

K. That I will execute such other documents as may be reasonably necessary to either (i) consummate the terms and conditions of this Agreement; or (ii) correct the terms and conditions of this Agreement if an error is detected after execution of this Agreement. I understand that either a corrected Agreement or a letter agreement containing the correction will be provided to me for my signature. At Lender's option, this Agreement will be void and of no legal effect upon notice of such error. If I elect not to sign any such corrective documentation, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement, and I will not be eligible for a modification under the Home Affordable Modification program.

L. Mortgage Electronic Registration Systems, Inc. ("MERS") is a separate corporation organized and existing under the laws of Delaware and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, 888-679-MERS. In cases where the loan has been registered with MERS who has only legal title to the interests granted by the borrower in the mortgage and who is acting solely as nominee for Lender and Lender's successors and assigns, MERS has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling the mortgage loan.

M. That Lender will collect and record personal information, including, but not limited to, my name, address, telephone number, social security number, credit score, income, payment history, government monitoring information, and information about account balances and activity. In addition, I understand and consent to the disclosure of my personal information and the terms of the Trial Period Plan and this Agreement by Lender to (i) the U.S. Department of the Treasury, (ii) Fannie Mae and Freddie Mac in connection with their responsibilities under the Home Affordability and Stability Plan; (iii) any investor, insurer, guarantor or servicer that owns, insures, guarantees or services my first lien or subordinate lien (if applicable) mortgage loan(s); (iv) companies that perform support services for the Home Affordable Modification Program and the Second Lien Modification Program; and (v) any HUD certified housing counselor.

N. That if any document related to the Loan Documents and/or this Agreement is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the loan as modified, or is otherwise missing, I will comply with the Lender's request to execute, acknowledge, initial and deliver to the Lender any documentation the Lender deems necessary. If the Note is replaced, the Lender hereby indemnifies me against any loss associated with a demand on the Note. All documents the Lender requests of me under this Section 4.N. shall be referred to as "Documents." I agree to deliver the Documents within ten (10) days after I receive the Lender's written request for such replacement.

O. That the mortgage insurance premiums on my Loan, if applicable, may increase as a result of the capitalization which will result in a higher total monthly payment. Furthermore, the date on which I may request cancellation of mortgage insurance may change as a result of the New Principal Balance.

**TAX CONSEQUENCES OF LOAN MODIFICATIONS.** There may be income tax consequences related to this loan modification. Because you will be responsible for paying any income tax due as a result of this loan modification, you may wish to consult a tax advisor to discuss your particular situation. For example, you may have to pay income tax on the amount of principal forgiven in this loan modification. This is because the amount of principal forgiven is generally considered income to you in the year forgiven, unless you qualify for a tax exclusion. Importantly, federal laws regarding the taxation of principal forgiveness changed in 2017. As of January 1, 2017, the Mortgage Forgiveness Debt Relief Act, which exempted certain borrowers from paying income tax on principal forgiven, is no longer in effect. SPS will report to you and the Internal Revenue Service the amount of principal forgiven in this loan modification on Form 1099-C by January 31 of the following year.

**BALLOON NOTICE.** In order to reach an affordable payment, we extended your amortization term, which is the rate or speed by which your mortgage is calculated to be paid off; however, your maturity term, which is the period of time until your mortgage becomes due and payable, could not be fully extended to an equal term. This is because the investor on your account allows us to change your amortization term but does not allow us to change the maturity term to match. As a result of the difference between these two periods, there will be an amount due $58,316.03 on the date your lien matures on October 1, 2035. The amount due at maturity is in addition to your monthly scheduled payment and the principal forbearance of $34,743.99 that you received as part of your modification.

OB718 1628

MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac
UNIFORM INSTRUMENT Form 3157
Deferred Principal Balance

0018345298

1126392

**Exhibit A (Legal Description)**

SITUATED IN THE TOWNSHIP OF SPRINGFIELD, COUNTY OF SUMMIT, AND STATE OF OHIO:

AND KNOWN AS BEING LOT NUMBERS SIXTY-FOUR (64) AND SIXTY-FIVE (65) IN THE LUCY S. STEVENS SHADYBROOK ALLOTMENT, AS RECORDED IN PLAT BOOK 43, PAGE 14-23 SUMMIT COUNTY RECORD OF PLATS, BE THE SAME MORE OR LESS, BUT SUBJECT TO ALL LEGAL HIGHWAYS.

[1] If more than one Borrower or Mortgagor is executing this document, each is referred to as "I." For purposes of this document words signifying the singular (such as "I") shall include the plural (such as "we") and vice versa where appropriate.

MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac UNIFORM
INSTRUMENT Form 3157  3/09  (rev. 10/10)

OB718                                                                                            0018345298

_[signature]_            _July 31, 2017_

GLENN E. HOLDEN -  Borrower        Date

_[signature]_            _July 31, 2017_

ANN M. HOLDEN-  Borrower        Date

**BORROWER ACKNOWLEDGEMENT**

State of: OH
County: SUMMIT

On the 31ST day of July, 2017, (year) before me the undersigned, personally appeared

**GLENN E. HOLDEN AND ANN M. HOLDEN, HUSBAND AND WIFE**

Personally known to me or provided to me on the basis of satisfactory evidence to be the individual whose names (s) is/are subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_[signature]_          KORI E. CALDERONE
Notary Public         NOTARY PUBLIC, STATE OF OHIO
                              SUMMIT COUNTY
                              My Commission Expires 5/18/2022

[1] If more than one Borrower or Mortgagor is executing this document, each is referred to as "I." For purposes of this document words signifying the singular (such as "I") shall include the plural (such as "we") and vice versa where appropriate.

MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac UNIFORM
INSTRUMENT Form 3157  3/09  (rev. 10/10)

OB718                                                             0018345298

Select Portfolio Servicing, Inc., Attorney in Fact for U.S. Deutsche Bank National Trust Company as Trustee for Soundview Home Loan Trust 2005-4, Asset-Backed Certificates, Series 2005-4

POA# 56413069

By: _____  Date: AUG 2 3 2017

Maria Landinez
Document Control Officer

POA TO BE RECORDED
CONCURRENTLY

STATE OF UTAH                                    COUNTY OF SALT LAKE

On ___AUG 2 3 2017___ before me, ___Molina Fresquez___ a Notary Public, personally appeared ___Maria Landinez___, who proved to me on the basis of satisfactory evidence to be the person(s) whose name (s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity (ies) and that by his/hers/their signature (s) on the instrument the person (s), or the entity upon behalf of which the person (s) acted, executed the instrument .

Witness my hand and official seal.

(Notary Name): _Molina Fresquez_

My commission expires: ___JAN 2 8 2019___

(Seal)
Notary Public

MOLINA FRESQUEZ
Notary Public State of Utah
My Commission Expires on:
January 28, 2019
Comm. Number: 681384

---

[1] If more than one Borrower or Mortgagor is executing this document, each is referred to as "I." For purposes of this document words signifying the singular (such as "I") shall include the plural (such as "we") and vice versa where appropriate.

MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3157  3/09  (rev. 10/10)

OB718                                                                    0018345298

EXHIBIT C

| Fill in this information to identify your case: | |
|---|---|
| Debtor 1 | **Glenn E. Holden** |
| | First Name      Middle Name      Last Name |
| Debtor 2 | **Ann M. Holden** |
| (Spouse, if filing) | First Name      Middle Name      Last Name |
| United States Bankruptcy Court for the: | Northern District of Ohio |
| Case number | **18-52112** |
| (If known) | |

Official Form 427

# Cover Sheet for Reaffirmation Agreement

12/15

Anyone who is a party to a reaffirmation agreement may fill out and file this form. Fill it out completely, attach it to the reaffirmation agreement, and file the documents within the time set under Bankruptcy Rule 4008.

| **Part 1:** | **Explain the Repayment Terms of the Reaffirmation Agreement** |
|---|---|

| | | | |
|---|---|---|---|
| 1. | **Who is the creditor?** | Select Portfolio Servicing, Inc. as servicing agent for Deutsche Bank National Trust Company as Trustee for Soundview Home Loan Loan Trust 2005-4, Asset-Backed Certificates, Series 2005-4 | |
| | | Name of the creditor | |

| | | | |
|---|---|---|---|
| 2. | **How much is the debt?** | On the date that the bankruptcy case is filed | $ 80,439.66 |
| | | To be paid under the reaffirmation agreement | $ 80,439.66 |
| | | $ 462.84 per month for 206 months (if fixed interest rate) | |

| | | | |
|---|---|---|---|
| 3. | **What is the Annual Percentage Rate (APR) of interest? (See Bankruptcy Code § 524(k)(3)(E).)** | Before the bankruptcy case was filed | 3.75 % |
| | | Under the reaffirmation agreement | 3.75 % ☑ Fixed rate ☐ Adjustable rate |

| | | | |
|---|---|---|---|
| 4. | **Does collateral secure the debt?** | ☐ No ☑ Yes. Describe the collateral. | 1050 Shadybrook Drive, Akron OH 44312 |
| | | Current market value | $ 49,350.00 |

| | | |
|---|---|---|
| 5. | **Does the creditor assert that the debt is nondischargeable?** | ☑ No ☐ Yes. Attach an explanation of the nature of the debt and the basis for contending that the debt is nondischargeable. |

| | | Income and expenses reported on Schedules I and J | Income and expenses stated on the reaffirmation agreement |
|---|---|---|---|
| 6. | **Using information from** *Schedule I: Your Income* (Official Form 106I) and *Schedule J: Your Expenses* (Official Form 106J), fill in the amounts. | 6a. Combined monthly income from line 12 of Schedule I  $ _____ | 6e. Monthly income from all sources after payroll deductions  $ _____ |
| | | 6b. Monthly expenses from line 22c of Schedule J  − $ _____ | 6f. Monthly expenses  − $ _____ |
| | | 6c. Monthly payments on all reaffirmed debts not listed on Schedule J  − $ _____ | 6g. Monthly payments on all reaffirmed debts not included in monthly expenses  − $ _____ |
| | | 6d. **Scheduled net monthly income**  $ _____  Subtract lines 6b and 6c from 6a. If the total is less than 0, put the number in brackets. | 6h. **Present net monthly income**  $ _____  Subtract lines 6f and 6g from 6e. If the total is less than 0, put the number in brackets. |